## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

WURTH BAER SUPPLY CO.,

        Plaintiff,

    v.

IAN STROUSE and ANDREW
HOMSHER,

        Defendants.

No. 4:21-CV-01913

(Chief Judge Brann)

## MEMORANDUM OPINION

### SEPTEMBER 9, 2022

Upset that his family's company was about to be sold, Ian Strouse teamed up with colleague Andrew Homsher to pilfer the company's confidential information before the sale was finalized. They downloaded client lists, customer orders, and sales notes, which, after resigning, they used to poach transactions and customers. The acquirer, Wurth Baer Supply Co., then initiated this suit against Strouse and Homsher, alleging breach of contract and fiduciary duty, tortious interference, conversion, misappropriation, civil conspiracy, and violations of certain state and federal statutes. Strouse responded with several counterclaims, accusing Wurth of failing to pay him sales commissions due as well as unlawfully using his name and likeness in online content without his approval. The parties then filed competing motions to dismiss. Based on the facts alleged, all but one of Wurth's claims may proceed; Strouse's counterclaims, however, cannot.

## I.     BACKGROUND

### A.     The Complaint

Prior to their resignations in late June and July 2021, Strouse and Homsher worked at Hermance and Strouse, Inc. ("Hermance"), a family-owned business that bought, sold, and serviced woodworking machinery.[1] Strouse served as Hermance's President and also owned a five percent (5%) stake in the company.[2] Homsher was the company's Information Technology Specialist.[3]

As conditions of their employment, Strouse and Homsher signed a document titled "Receipt and Acknowledgement Of Hermance Machine Company Employee Manual."[4] Wurth characterizes this document as a "confidentiality agreement," as it includes an express prohibition on disclosing, using outside of Hermance's premises, or otherwise exploiting "employment confidential information."[5] Per the confidentiality agreement, the term "employee confidential information" includes "product designs, marketing strategies, customer lists, pricing policies, and other related information."[6]

---

[1]   Doc. 1 ¶¶ 2–5.

[2]   *Id*. ¶ 4.

[3]   *Id*. ¶ 5.

[4]   Doc. 1 ¶ 9; *see also* Doc. 1-1, Ex. 1 (Apr. 19, 2006 Strouse Confidentiality Agreement); Doc. 1-2, Ex. 2 (Oct. 15, 2015 Homsher Confidentiality Agreement).

[5]   *Id*.

[6]   *Id*.

Connected to his work at Hermance, Strouse helped form an entity named Highland Automation and Robotics, LLC at some point prior to 2020.[7] Highland Automation operated as the robotics division arm for Hermance, which paid to establish and create Highland Automation.[8] Strouse was Highland Automations sole member and registered agent.[9]

In June 2020, Wurth began pursuing a possible acquisition of Hermance.[10] Opinions about the prospective transaction inside Hermance were mixed: Strouse "loudly voiced his opposition to the sale," but Hermance's remaining shareholders wanted the sale to proceed.[11] Ultimately, after thirteen months of negotiations, the companies completed the transaction and Wurth purchased substantially all of Hermance's assets, including its trade secrets and the confidential and proprietary information Hermance maintained digitally on its secure network.[12]

But during the companies' negotiations, Strouse and Homsher allegedly engaged in a covert campaign to procure and remove from Hermance's digital network the company's internal data on customer orders (past and prospective) as

---

[7]    Doc. 1 ¶ 11.
[8]    *Id.*
[9]    *Id.*
[10]   *Id.* ¶ 10.
[11]   *Id.*
[12]   *Id.* ¶ 2.

well as other confidential information.[13] Wurth details the following sequence of data misappropriation:

- **April 2 – April 7, 2021**: Strouse downloaded from Hermance's computers and cloud storage network to a personal device (a) more than 20 gigabytes of customer notes taken by Brian Mcquillen, one of Hermance's salespeople; (b) dozens of pages of customer notes taken by Lee Chilson, another Hermance salesperson; and (c) a purchase order between Hermance and a customer.

- **April 12, 2021**: Strouse sent an email from Hermance's network to his personal email address attaching a purchase order between Highland Automation (seller) and Fanuc America (purchaser).

- **April 14, 2021**: Strouse downloaded from Hermance's network to a personal device more than 20 gigabytes of customer notes taken by Gary Lundy, another Hermance salesman.

- **April 23, 2021**: Strouse downloaded from Hermance's network to a personal device several of Hermance's existing quotes and customer notes, including quotes made to Hermance customer Nydree Flooring, LLC.

- **April 28, 2021**: Strouse downloaded from Hermance's network to a personal device price quotes and customer payments as well as notes regarding Hermance customer JC Woods Products.

- **April 29, 2021**: Strouse downloaded from Hermance's network to a personal device pricing information for a vendor named Circle T.

- **April 30, 2021**: Homsher downloaded from Hermance's network to a personal device Hermance sales information.

---

[13]   *Id*. ¶ 14. The confidential information that Strouse and Homsher had access to includes the following: "Hermance's product designs, marketing strategies, customer lists, pricing policies, cost and pricing structure, sales and marketing initiatives and strategies, sales quotes, intellectual property, customer lists and other related information and internal operating methods and systems, customer histories and, most importantly, notes of Hermance's sales personnel regarding customer's future needs and timelines, product inquiries, product prices and potential terms of sale." *Id*. ¶ 12.

- **May 13, 2021**: Strouse forwarded from Hermance's network to his personal Yahoo email account a customer quote.

- **May 17, 2021**: Strouse forwarded from Hermance's network to his Highland Automation email address an email containing the commission statement for Hermance customer Sledges Millwork.[14]

According to Wurth, neither Strouse nor Homsher had the authority to remove this allegedly confidential information from Hermance's network.[15]

As Strouse and Homsher sought to obtain this information and in the months that followed, they took various actions to conceal their data misappropriation efforts:

- **April 14, 2021**: After Strouse downloaded Hermance salesman Gary Lundy's customer notes, Homsher deleted Lundy's notes from Hermance's network.

- **June 18, 2021**: Homsher deleted an email that purportedly detailed his data gathering efforts.

- **June 21, 2021**: Homsher downloaded various folders from his Hermance OneDrive to his local PC, and also deleted from Hermance's network a folder titled "Documents\/Documents\/SuiteCommerce Site Builder – Kilimanjaro\/node_modules."

- **June 22, 2021**: Homsher altered the data access and privileges on Hermance's network—downgrading a colleague's co-admin account, removing several members from the email distribution group "Highland Automation," and deleting the group "Highland Automation" from Azure—and then deleted a message from his email inbox with the subject "Your admin privileges were transferred." Homsher also deleted most of the folders and files in his Hermance OneDrive.

---

[14]   Doc. 1 ¶¶ 15–27.

[15]   *Id.*

- **June 23 – June 24, 2021**: Homsher engaged in allegedly suspicious email activity—for example, on June 24, Homsher created an email from his Hermance email account with the subject "attention" and then deleted the response he received—and ran a series of suspect security and compliance searches.

- **June 28, 2021**: Homsher downloaded a pdf containing a list of Hermance salesmen.

- **July 1, 2021**: Homsher moved several emails to the "Deleted Items" folder.

- **July 2, 2021**: Homsher downloaded a folder titled "Highland Automation & Robotics" as well as related information on the company's website. He also moved all his email messages to the "Deleted Items" folder and "soft deleted" many of them.[16]

Strouse resigned from Hermance on June 28, 2021, and Homsher resigned the following week, on July 2, 2021.[17] But two days prior to Strouse's resignation, Strouse paid Homsher $10,000.[18] According to Wurth, this payment was not in consideration for any work Homsher did on Hermance's behalf; it was instead payment in consideration for "Homsher's involvement in the data theft."[19]

Following their resignations, Strouse and Homsher continued to work for Highland Automation, which began operating independent of Hermance.[20] Indeed, Wurth alleges that Strouse transformed Highland Automation into Hermance's

---

[16] *Id*. ¶¶ 20, 29–42.
[17] *Id*. ¶¶ 4–5.
[18] *Id*. ¶ 44.
[19] *Id*.
[20] *Id*.

direct competitor, weaponizing the stolen information to interfere with Hermance's client relationships and poach pending and prospective client orders.[21]

Wurth highlights a transaction with longstanding Hermance customer Nydree Flooring, LLC, a wood flooring manufacturer.[22] On April 3, 2020, Hermance received a signed sales order from Nydree for the purchase of a custom Veneer Feeding System, which cost $242,000.[23] Additionally, Hermance and Nydree negotiated two separate sales agreements for different machines, valued at $720,000 and $200,000, respectively.[24] Nydree then paid Hermance an initial deposit of $112,500 toward the Veneer Feeding System purchase.[25] To complete the sale, Hermance placed an order to procure the system from third-party manufacturer and distributor Ogden Sales Group, LLC, which required a $100,000 deposit.[26]

On July 21, 2021—three weeks after Strouse resigned from Hermance—Strouse called Hermance's controller and demanded that she terminate the April 3, 2020 sales order between Hermance and Nydree.[27] Strouse told the controller that he "caused Nydree to terminate its contract with Hermance and that the Nydree [t]ransaction was now being handled by Highland Automation, Strouse's

---

21 *Id*. ¶¶ 45–54.
22 *Id*. ¶ 45.
23 *Id*. ¶ 46; *see also* Doc. 1-3, Ex. C (Apr. 3, 2020 Nydree Sales Order).
24 Doc. 1 ¶ 46; *see also* Doc. 1-4, Ex. D (Dec. 2, 2020 Nydree Quote).
25 Doc. 1 ¶ 46.
26 *Id*. ¶ 47.
27 *Id*. ¶ 48.

company."[28] Strouse then called Hermance salesman Gary Lundy and Nydree's principal, Barry Brubaker, and informed them that Strouse and Highland Automation were now the sales representatives for Ogden—the third-party manufacturer that Hermance contracted with to procure the Veneer Feeding System for Nydree—and that Hermance would have no further role in the Nydree transaction.[29]

Ten days later, Wurth completed its long-planned acquisition of Hermance.[30] A representative from Wurth then called Ogden's principal, Karl Ogden, to clarify the circumstances surrounding the Nydree-Hermance transaction.[31] Karl Ogden informed Wurth that Ogden was now working with Highland Automation—not Hermance/Wurth—on the Nydree transaction, but that Ogden would be keeping Hermance's $100,000 deposit.[32] Shortly thereafter, Wurth learned that Nydree placed an additional order with Highland Automation for $920,000 worth of machinery—a purchase that Nydree negotiated with Hermance before Strouse and Homsher resigned.[33]

Separately, Wurth alleges that Strouse and Homsher "hijacked" several Hermance social media accounts.[34] According to Wurth, Strouse and Homsher

---

[28] *Id.* (internal quotation marks omitted).
[29] *Id.* ¶ 49.
[30] *Id.* ¶ 2.
[31] *Id.* ¶ 51.
[32] *Id.*
[33] *Id.* ¶ 54.
[34] *Id.* ¶ 56.

"manipulated Hermance's LinkedIn account to appear to be a Highland Automation account," directing customers seeking to access Hermance's LinkedIn page to Highland Automation's LinkedIn page, which improperly featured Hermance's protected content.[35] Strouse and Hermance similarly appropriated Hermance's YouTube content, imposing the "Highland Automation and Robotics" logo on Hermance-produced and created videos.[36]

Based on these facts, Wurth advances eight causes of action:

- **Count I** – Breach of Fiduciary Duty (against Strouse and Homsher);[37]

- **Count II** – Tortious Interference of Contract (against Strouse);[38]

- **Count III** – Tortious Interference with Prospective Economic Advantage (against Strouse);[39]

- **Count IV** – Breach of Contract (against Strouse and Homsher);[40]

- **Count V** – Violation of Pennsylvania Uniform Trade Secrets Act (against Strouse and Homsher);[41]

- **Count VI** – Violation of Computer Fraud and Abuse Act (against Strouse and Homsher);[42]

- **Count VII** – Conversion and Misappropriation of Confidential Information (against Strouse and Homsher);[43] and

---

[35] *Id.*

[36] *Id.* ¶ 57.

[37] *Id.* ¶¶ 58–62.

[38] *Id.* ¶¶ 63–68.

[39] *Id.* ¶¶ 69–73.

[40] *Id.* ¶¶ 74–77.

[41] *Id.* ¶¶ 78–84.

[42] *Id.* ¶¶ 85–89.

[43] *Id.* ¶¶ 90–99.

- **Count VIII** – Civil Conspiracy (against Strouse and Homsher).[44]

## B.    Strouse's Answer and Counterclaims

On January 11, 2022, Strouse filed an Answer to Wurth's Complaint, which details his responses to Wurth's allegations and also asserts certain affirmatives defenses and counterclaims.[45] Relevant here, Strouse presents four counterclaims against Wurth: (1) unjust enrichment;[46] (2) invasion of privacy—misappropriation of name and likeness;[47] (3) right of publicity;[48] and (4) declaratory judgment.[49] In his declaratory judgment counterclaim, Strouse asks the Court to enter an order declaring the following:

- "Strouse is not currently and never was subject to an agreement with either Hermance or Wurth that prevented him or prevents him, either personally or through [Highland Automation], from competing with either company";

- "Wurth did not purchase from Hermance any of the claims or causes of action asserted in the Complaint";

- "Strouse is not prohibited from using any alleged trade secrets identified by Wurth, including, without limitation, those shared by Hermance to [Highland Automation]";

- "Preliminarily and permanently enjoining Wurth from prohibiting Mr. Strouse from operating or working for [Highland Automation]";

---

[44] *Id*. ¶¶ 100–04.
[45] Doc. 14.
[46] *Id*. ¶¶ 42–49.
[47] *Id*. ¶¶ 50–54.
[48] *Id*. ¶¶ 55–59.
[49] *Id*. ¶¶ 60–81.

- "Preliminarily and permanently enjoining Wurth from prohibiting Mr. Strouse from using the Information for the benefit of [Highland Automation]"; and

- "Awarding Mr. Strouse costs, attorneys' fees and any other appropriate relief."[50]

In support of these claims, Strouse offers a competing set of factual allegations. First, Strouse alleges that he formed Highland Automation in 2017, and that the company is not, and never has been, a subsidiary of Hermance.[51] Instead, Strouse asserts, Highland Automation has always been in the business of selling and servicing machines, automation, and robotics used in the manufacture of wood, plastics, and composites, and that Hermance merely "worked cooperatively" with Highland Automation to assist it in soliciting and servicing Hermance customers.[52] As such, Hermance and Highland Automation shared "without restriction or understanding of confidentiality" the Hermance information detailed in the Complaint, including product designs, marketing strategies, customer lists, pricing policies, sales quotes, intellectual property, and notes of Hermance's sales personnel regarding customer needs and timelines, product inquiries, product prices, and potential terms of sale.[53]

Second, Strouse asserts that Highland Automation is not mentioned in the asset purchase agreement between Hermance and Wurth, and that neither

---

[50]   *Id.* at 52–53.
[51]   *Id.* ¶¶ 11–13.
[52]   *Id.* ¶¶ 14–15.
[53]   *Id.* at 16.

Hermance nor Wurth asked Strouse to a sign a non-competition agreement or otherwise limit his ability to compete with Hermance.[54]

Third, Strouse accuses Wurth of making false comments about him to vendors and customers common to Wurth and Highland Automation with the intent of harming his reputation.[55] Strouse provides no detail on who at Wurth made these alleged comments or when, how, and to whom the comments were made.

Fourth, Strouse alleges that Wurth has wrongfully withheld commissions he earned.[56] Strouse explains that when employed at Hermance, he received commission on each sale he closed: 25% of the profit for the sale of new machines; 5% for the sales of used machines.[57] According to Strouse, at the time of his departure, he had finalized approximately $3 million in sales for which he was never compensated.[58] Strouse believes that after he left Hermance, Wurth (which, again, acquired Hermance) received payment on more than half of the sales he previously negotiated.[59]

And fifth, Strouse asserts that Wurth's business website displays videos of Strouse describing projects completed either cooperatively by Hermance and

---

[54] *Id.* ¶¶ 18, 20.
[55] *Id.* ¶ 24.
[56] *Id.* ¶¶ 25–36.
[57] *Id.* ¶¶ 25–28.
[58] *Id.* ¶ 30.
[59] *Id.* ¶ 31.

Highland Automation or solely by Highland Automation.[60] Further, Strouse notes that some of these videos were housed on his personal YouTube account, and that he never signed any release with either Hermance or Wurth allowing them to display his videos or use his name or likeness for commercial or other purposes.[61]

### C.     Procedural History

On January 11, 2022, Strouse and Homsher filed separate motions to dismiss Wurth's Complaint.[62] Three weeks later, Wurth responded in kind with a motion to dismiss Strouse's counterclaims.[63] All three motions have been fully briefed and are now ripe for disposition.[64]

## II.    LAW

Under Federal Rule of Civil Procedure 12(b)(6), the Court dismisses a complaint, in whole or in part, if the plaintiff fails to "state a claim upon which relief can be granted." Following the landmark decisions of *Bell Atlantic Corp. v. Twombly*[65] and *Ashcroft v. Iqbal*,[66] "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"[67] The United States Court of Appeals for the Third

---

[60]  *Id*. ¶ 37.
[61]  *Id*. ¶¶ 38–40.
[62]  Doc. 12 (Strouse Motion to Dismiss); Doc. 15 (Homsher Motion to Dismiss).
[63]  Doc. 19.
[64]  Strouse's motion to dismiss: Doc. 13; Doc. 17; Doc. 25. Homsher's motion to dismiss: Doc. 16; Doc. 18; Doc. 26. Wurths' motion to dismiss: Doc. 20; Doc. 30; Doc. 32.
[65]  550 U.S. 544 (2007).
[66]  556 U.S. 662 (2009).
[67]  *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570).

Circuit has instructed that "[u]nder the pleading regime established by *Twombly* and *Iqbal*, a court reviewing the sufficiency of a complaint must take three steps": (1) "take note of the elements the plaintiff must plead to state a claim"; (2) "identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth"; and (3) "assume the[] veracity" of all "well-pleaded factual allegations" and then "determine whether they plausibly give rise to an entitlement to relief."[68]

## III.   ANALYSIS

### A.     Strouse's and Homsher's Motions to Dismiss the Complaint

In their motions to dismiss, Strouse and Homsher ask the Court to dismiss, in whole or in part, six of Wurth's eight claims: Counts II (tortious interference with contract), III (tortious interference with prospective economic advantage), IV (breach of contract), VI (violation of the Computer Fraud and Abuse Act), VII (conversation and misappropriation), and VIII (civil conspiracy).[69] They do not contest Counts I (breach of fiduciary duty) or V (violation of Pennsylvania Uniform Trade Secrets Act). For its part, Wurth has agreed to withdraw Count VI, which concerns the Computer Fraud and Abuse Act.[70] Accordingly, the claims that

---

[68]  *Connelly v. Lane Construction Corp.*, 809 F.3d 780, 787 (3d Cir. 2016) (internal quotations and citations omitted).

[69]  *See* Doc. 13; Doc. 16.

[70]  *See* Doc. 17 at 12; Doc. 18 at 10.

remain at issue here are Counts II, III, IV, VII, and VIII. The Court addresses each in turn.[71]

### 1.    Count II – Tortious Interference with Contract

Wurth predicates its claim for tortious interference with contract on Strouse's successful efforts to impede what Wurth calls "the Nydree Transaction," which, properly understood, consists of two distinct components: (1) the April 2020 sales order between Hermance and Nydree for the purchase of a $242,000 custom Veneer Feeding System; and (2) the prospective sale of additional, unidentified machines to Nydree priced at approximately $920,000 million.[72] Strouse moves for partial dismissal of this count, arguing that although the April 2020 sales order can serve as a valid basis for a tortious interference with contract claim, the negotiations for the sale of additional machines cannot.[73] According to Strouse, the negotiations for the additional machines "are not contracts";[74] they are

---

[71] Although Strouse filed his motion to dismiss and Answer on the same day, the motion to dismiss (Doc. 12) preceded the Answer (Doc. 14). Accordingly, the filings were procedurally proper. *See* Fed. R. Civ. P. 12(b) ("A motion asserting any [Rule 12(b)] defenses must be made before a pleading if a responsive pleading is allowed."). And even if the filings were made simultaneously, the Court has the discretion to consider the motion to dismiss. *See Daniels v. Kowalkowski*, 2004 WL 541733, at *1–2 (M.D. Pa. Feb. 4, 2004) (Caputo, J.) (electing to "consider any defenses for failure to state a claim upon which relief can be granted which were raised in Defendants' Motion to Dismiss" despite the "untimeliness of their filings"—the answer (Doc. 9) was filed earlier on the same day as the motion to dismiss (Doc. 9)); ( *Landcare USA, LLC v. LaCapra*, 2016 WL 11779380, at *2 n.5 (M.D. Fla. Sept. 20, 2016) ("[W]here the Motion to Dismiss and Answer are filed simultaneously, as they were here—electronically on the same day at 3:00 p.m. and 3:07 p m.—the Court has the discretion to view the Motion as having preceded the Answer and having been timely presented.").

[72] *See* Doc. 1 ¶¶ 46, 48, 65–67.

[73] Doc. 13 at 5–6.

[74] *Id*. at 6.

instead, at best, "prospective contractual relations not yet reduced to contract."[75] The Court agrees.

The Pennsylvania Supreme Court has long recognized an individual cause of action for tortious interference with contractual relations.[76] And consistent with the Restatement (Second) of Torts,[77] Pennsylvania courts "separate those instances in which there has been an alleged interference with an existing contract right from instances in which the interference is charged with affecting prospective contractual relations."[78] Although the legal standards for tortious interference with contract and tortious interference with prospective contractual relations overlap,[79] these distinct causes of action concern different contractual scenarios: tortious interference with contract "is concerned only with intentional interference with subsisting contracts," whereas tortious interference with prospective contractual relations concerns interference with "relations not yet reduced to contract."[80]

---

[75] Doc. 25 at 4.

[76] *See Thompson Coal Co. v. Pike Coal Co.*, 412 A.2d 466, 470 (Pa. 1979) (collecting cases applying tort as articulated in Restatement of Torts § 766 (1939)).

[77] *See* Restatement (Second) of Torts § 766 (1977) (interference with existing contract); Restatement (Second) of Torts § 766B (interference with prospective relations).

[78] *Thompson Coal*, 412 A.2d at 470.

[79] *See Pelagatti v. Cohen*, 536 A.2d 1337, 1343 (Pa. Super. 1987) (outlining four elements that must be pleaded to "set forth a legally sufficient cause of action for intentional interference with contractual or prospective contractual relations").

[80] Restatement (Second) of Torts § 766 cmt. a; *see also Advanced Power Systems, Inc. v. Hi-Tech Systems, Inc.*, 801 F. Supp. 1450, 1459 (E.D. Pa. 1992) ("If it were true . . . that the cancellation of an *existing* contract can provide the basis of a claim of tortious interference with *prospective* relations, there would be little basis for distinguishing between the tort [of intentional interference with contract] and the tort [of intentional interference with prospective contractual relations].").

Accordingly, to state a claim for tortious interference with contract, a plaintiff must first allege there was an existing contract in place.[81]

Here, Wurth does not allege that Hermance had a contract with Nydree for the sale of additional machines worth $920,000.[82] Wurth asserts only that Hermance "negotiated" the sales of one additional machine for $720,000 and another for $200,000.[83] Although Hermance provided Nydree with a quote for the $720,000 sale, Wurth does not allege that Nydree committed to purchase the machine at that price.[84] As such, neither the sale for the $720,000 machine nor the sale for the $200,000 machine constitute an existing contract. Although Count II may proceed based on the April 2020 sales order, the prospective sales totaling $920,000 are relevant only to Count III.

### 2. Count III – Tortious Interference with Prospective Economic Advantage

For its tortious interference with prospective economic advantage claim, Wurth points to the potential sale of $920,000 in additional machines to Nydree as well as "prospective contractual relationships with many of the customers

---

[81] *See Thompson Coal*, 412 A.2d at 471 (because the plaintiffs "have failed to set forth any contract right on their part which was injured through the actions of [the defendant], . . . further inquiry need be directed only to the question whether appellees intentionally [interfered] with any prospective interest of [the plaintiffs]"); *see also Multitherm Corp. v. Fuhr*, 1991 WL 146233, at *22 (E.D. Pa. July 24, 1991) (granting summary judgment on tortious interference with contract claim because the plaintiff "offered no evidence that [the defendants] induced any third party not to perform an existing contract"; addressing separately the question of "interference with prospective contractual relations").

[82] *See* Doc. 1 ¶ 46.

[83] *Id*.

[84] *Id*.

identified in the salesmen's notes and quotes that Strouse stole."[85] Unsurprisingly, given their arguments in opposition to Count II, the Defendants do not dispute that the prospective transactions with Nydree form viable predicates for Count III;[86] instead, they argue that Count III should limited to those allegations.[87] They contend that Wurth's "generalized claims" about prospective contractual relationships with "many of the customers identified in the salesmen's notes and quotes that Strouse stole" cannot serve as a predicate for this claim because these allegations lack the specificity the prevailing legal authority demands.[88] But, on this, the Court finds the Defendants' protestations unavailing.

Under Pennsylvania law, a claim of tortious interference with prospective economic advantage must allege (1) a prospective contractual relationship, (2) the defendant's intent to harm the plaintiff by preventing the prospective relationship from occurring, (3) the absence of privilege or justification on the part of the defendant, and (4) actual damages resulting from the defendant's conduct.[89] Although recognizing that the term "prospective contractual relationship" is "problematic," in that it eludes "precise definition," the Pennsylvania Supreme Court offers the following guidance: "It is something less than a contractual right,

---

[85]  *Id*. ¶ 70.
[86]  *See* Doc. 13 at 6–8; Doc. 25 at 4–5.
[87]  Doc. 25 at 5 ("Count III must be dismissed except as to the alleged prospective transactions with Nydree.").
[88]  Doc. 13 at 7 (quoting Doc. 1 ¶ 70).
[89]  *Kachmar v. SunGard Data Systems, Inc.*, 109 F.3d 173, 184 (3d Cir. 1997).

something more than a mere hope."[90] Unsurprisingly, district courts have struggled to articulate clear standards for what plaintiffs must allege on this claim to satisfy their pleading obligations under *Twombly* and *Iqbal*.[91]

This Court finds most persuasive a 2017 ruling by the United States District Court for the Eastern District of Pennsylvania in *E. Frank Hopkins Seafood Co., Inc. v. Olizi*.[92] There, the plaintiff "pleaded the existence of confidential information regarding prospective customers, as well as the existence of anticipated customers who were instead enticed to contract with [the defendants] due to the [the defendants'] access to such information."[93] The plaintiff further alleged "that by use of [its] confidential information, [the] Defendants succeeded in inducing [the plaintiff's] prospective customers . . . to instead contract with [the] Defendants."[94] Although the plaintiff did not identify any prospective customers by name, the court ruled that "[a]t this case's nascent, pre-discovery stage, and

---

[90]   *Thompson Coal*, 412 A.2d at 471.

[91]   *Compare AutoTrakk, LLC v. Automotive Leasing Specialists, Inc.*, 2017 WL 2936730, at *10
–11 (M.D. Pa. July 10, 2017) (dismissing without prejudice tortious interference with prospective relations claim because "[a]lthough the amended complaint contains allegations that [the defendant] has solicited business from [the plaintiff's] customers in general, no third-party dealerships have been identified in the complaint, nor has there been any clarification on the relationships harmed or the continued nature of such interference"), *with Synthes (U.S.A.) v. Globus Medical, Inc.*, 2005 WL 2233441 (E.D. Pa. Sept. 14, 2005) (holding that the plaintiff's allegations that the defendant's "defamatory statements were directed toward potential employees, users, and purchasers of [the plaintiff's] products" were sufficient to plead intentional interference with contractual relations because "a plaintiff is not required to identify a potential contractual partner by name") (citing *Kelly-Springfield Tire Co. v. D'Ambro*, 596 A.2d 867 (Pa. 1991)).

[92]   2017 WL 2619000 (E.D. Pa. June 16, 2017).

[93]   *Id*. at *5.

[94]   *Id*.

considering the pleading standards under Rule 8(a), [the] Plaintiff has sufficiently pleaded this element (and thus, this claim)."[95]

From *E. Frank Hopkins*, this Court gleans the following principle: for tortious interference with prospective contractual relations claims, a plaintiff's failure to identify a potential contractual partner by name does not necessitate dismissal; the claim may proceed if supported by specific allegations about the universe of prospective counterparties and predicate actions indicating interference. Here, as in *E. Frank Hopkins*, the Complaint does not name all potential contractual partners, but it provides sufficient supporting allegations to avoid dismissal. Specifically, Wurth notes that it "had prospective contractual relationships with many of the customers identified in the salesmen's notes and quotes"[96] (i.e., the universe of prospective counterparties) and extensively documents the Defendants' efforts to misappropriate this confidential information in the months before resigning[97] (i.e., predicate actions indicating interference). Accordingly, the Defendants' motions for partial dismissal as to Count III are denied.

---

[95] *Id.*
[96] Doc. 1 ¶ 70.
[97] *Id.* ¶¶ 14–44.

### 3.      Count IV – Breach of Contract

The Defendants next move to dismiss Count IV (breach of contract), arguing that Wurth fails to allege the existence of an enforceable contract.[98] Specifically, the Defendants assert that the Confidentiality Agreement that both Strouse and Homsher signed "disclaims a contractual relationship"—that is, it "explicitly provides that [Strouse's and Homsher's] employment is at-will"—and that Wurth does not plead any facts supporting consideration for their signatures.[99] Wurth responds that "whether [the Defendants'] employment was at-will or pursuant to an employment contract is entirely irrelevant"; by signing the confidentiality agreement, which was a condition of their employment, the Defendants "assumed a contractual duty not to disclose confidential information" or "utilize or exploit this information with any other individual or company."[100] The Court agrees with Wurth.

To maintain a claim for breach of contract, a plaintiff must establish three things: "(1) the existence of a contract, including its essential terms; (2) a breach of the contract; and (3) resultant damages."[101] In the employment context, Pennsylvania courts distinguish between at-will employment relationships, the

---

[98]   Doc. 13 at 8–9.
[99]   *Id.*
[100]  Doc. 17 at 11–12 (citation omitted).
[101]  *Meyer, Darragh, Buckler, Bebenek & Eck, P.L.L.C. v. Law Firm of Malone Middleman, P.C.*, 137 A.3d 1247, 1258 (Pa. 2016).

21

termination of which does not support a breach of contract claim,[102] and a

contractual employment relationship, which can give rise to a claim for breach.[103]

That said, at-will employees may still be subject to restrictive covenants that, if

violated, support breach of contract claims.[104] Specifically, when an at-will

employee enters into a confidentiality agreement—committing to safeguard her

employer's confidential information—as a condition of her employment, violating

that agreement can qualify as a contractual breach.[105]

Here, Wurth alleges that Strouse's and Homsher's employment, although at-

will, "was subject to the terms and conditions set forth in Hermance's Employee

Manual," which includes an express prohibition on disclosing, using outside of

Hermance's premises, or otherwise exploiting "employment confidential

---

[102] *See Rapagnani v. Judas Co.*, 736 A.2d 666, 669 (Pa. Super. 1999) ("As a general rule, there is no common law cause of action against an employer for termination of an at-will employment relationship.") (citation omitted); *Preobrazhenskaya v. Mercy Hall Infirmary*, 71 F. App'x 936, 940–41 (3d Cir. 2003) (holding that employment at-will precludes breach of contract claim related to employment termination).

[103] *See Sullivan v. Chartwell Investment Partners*, 873 A.2d 710, 717 (Pa. Super. 2005) (denying motion to dismiss breach of contract claim because the plaintiff alleged the existence of an enforceable employment contract); *cf. Clark v. Chmielewski*, 2004 WL 1503762, at *5 (E.D. Pa. Feb. 26, 2004) ("Absent an employment contract [a plaintiff] cannot successfully raise a breach of contract claim.").

[104] *See Socko v. Mid-Atlantic Systems of CPA, Inc.*, 126 A.3d 1266, 1273–74 (Pa. 2015) (recognizing restrictive covenants—such as those designed "to safeguard an employer's . . . proprietary business information"—as a "contractual exception to the at-will doctrine").

[105] *See, e.g., United States ex rel. Notorfransesco v. Surgical Monitoring Assoc.*, 2014 WL 7008561 (E.D. Pa. Dec. 12, 2014) (denying motion to dismiss breach of contract claim based on violation of at-will employee's confidentiality agreement); *KBS Pharmacy, Inc. v. Patel*, 2021 WL 2351961, at *4–5 (E.D. Pa. June 9, 2021) (dismissing breach of fiduciary claim as duplicative of employer's viable breach of contract claim based on employees' misappropriation of the employer's confidential information in violation of confidentiality agreement "signed as a condition of their employment").

22

information."[106] The signed confidentiality agreements define "employee confidential information" as including "product designs, marketing strategies, customer lists, pricing policies, and other related information."[107] According to Wurth, Strouse and Homsher breached the confidentiality agreements when they downloaded (and then deleted) Hermance's customer data and other confidential information without authority and for the purpose of establishing a competing business.[108] Wurth alleges this breach resulted in damages in excess of $1 million.[109]

These allegations, considered in a light most favorable to Wurth, state a claim for breach of contract: Wurth identifies an enforceable contract (the confidentiality agreements upon which Strouse's and Homsher's employment were conditioned) that Strouse and Homsher breached by misappropriating Hermance's confidential information, resulting in substantial monetary damages. Accordingly, Strouse's and Homsher's motions to dismiss as to Count IV are denied.[110]

---

[106] Doc. 1 ¶ 9; *see also* Doc. 1-1, Ex. 1 (Apr. 19, 2006 Strouse Confidentiality Agreement); Doc. 1-2, Ex. 2 (Oct. 15, 2015 Homsher Confidentiality Agreement).

[107] Doc. 1-1, Ex. 1 (Apr. 19, 2006 Strouse Confidentiality Agreement); Doc. 1-2, Ex. 2 (Oct. 15, 2015 Homsher Confidentiality Agreement).

[108] Doc. 1 ¶ 76.

[109] *Id*. ¶ 77.

[110] Separately, Homsher asserts that the Confidentiality Agreement "has absolutely no connection to [his] employment as it relates to [Wurth's] allegations" because the agreement lists as Homsher's position "Shipping/receiving warehouse," but in its Complaint, Wurth alleges that Homsher was employed as "Hermance's Information Technology Specialist." Doc. 16 at 4 (citations omitted). The Court disagrees. Absent some indication that Homsher did not sign this agreement or that this agreement applied to Homsher only in his capacity as a "[s]hipping/receiving warehouse" employee, the Court accepts as true Wurth's allegation that

### 4.     Count VII – Conversion and Misappropriation of Confidential Information

In Count VII, Wurth asserts claims for conversion and misappropriation of confidential information.[111] The Defendants' motions to dismiss challenge only Wurth's misappropriation claim.[112] Under Pennsylvania law, to state a claim for misappropriation, a plaintiff must allege (a) it made a substantial investment of time, effort, and money into creating the thing misappropriated, such that the court can characterize that "thing" as a property right; (2) the defendant appropriated the "thing" at little or no cost, such that the defendant reaped what he did not sow; and (3) the defendant injured the plaintiff.[113]

Here, the Defendants dispute only the first element: whether Wurth alleged that it (or, more appropriately, Hermance) "made a substantial investment of time, effort, and money creating the confidential information allegedly misappropriated."[114] But as Wurth explains, it alleges that "Hermance spent thousands of hours and hundreds of thousands of dollars creating the Confidential Information that Strouse and Homsher stole."[115] Further, the Court agrees with Wurth that based on its allegations regarding the efforts it took to preserve the

---

the agreement was in place and applied to Homsher's conduct prior to his resignation in July 2021. *See* Doc. 1 ¶¶ 5, 9.

[111] Doc. 1 ¶¶ 90–99.

[112] *See* Doc. 13 at 13–14.

[113] *Westport Insurance Corp. v. Hanft & Knight, P.C.*, 523 F. Supp. 2d 444, 460 (M.D. Pa. 2007) (Jones, J.) (citing *Sorbee International Ltd. v. Chubb Custom Insurance Co.*, 735 A.2d 712, 716 (Pa. Super. 1999)).

[114] Doc. 13 at 14.

[115] Doc. 1 ¶ 60.

confidentiality of the information at issue, the nature of that information (i.e., notes from Hermance's sales personnel regarding customer's future needs and timelines, product inquiries, product prices, and potential terms of sale), and the value and importance of that information to Wurth's business, "it is reasonable to infer that Hermance and its employees invested substantial time, money, and effort into creating the information."[116] The Defendants motions to dismiss as to Count VII are therefore denied.

### 5.    Count VIII – Civil Conspiracy

Lastly, the Defendants argue that the civil conspiracy claim should be dismissed because Wurth "failed to plead facts sufficient to demonstrate that [their] alleged actions were undertaken with an intent to injure Wurth."[117] Specifically, the Defendants argue that because Wurth alleges that they allegedly stole and used the confidential information "for their own personal gain," Wurth has not pleaded that they acted "solely to injure."[118] Wurth counters that "the mere fact that [the Defendants'] improper actions were economically beneficial to them does not preclude a civil conspiracy claim."[119] According to Wurth, courts in this Circuit recognize that a defendant may be held liable for civil conspiracy if he acts with

---

[116] Doc. 17 at 12–13 (citing Doc. 1 ¶¶ 12, 15–16, 19, 92–94).
[117] Doc. 13 at 14.
[118] *Id.* at 15.
[119] Doc. 17 at 14.

mixed motives—that is, to injure the plaintiff *and* to benefit himself economically.[120]

To state a claim for civil conspiracy, a plaintiff must allege (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act in furtherance of the conspiracy; and (3) actual legal damages.[121] Further, proof of malice—defined as an "intent to injure"—is required.[122]

Courts in this Circuit disagree on what a plaintiff must plead, and then show, to demonstrate the defendant's "intent to injure." In its seminal case on the subject, *Thompson Coal*, the Pennsylvania Supreme Court held that "unlawful intent must be absent justification."[123] There, the Pennsylvania Supreme Court affirmed summary judgment and thus dismissed the civil conspiracy claim, offering the following explanation:

> There are no facts of record which indicate that Johnston acted solely to injure appellants. To the contrary, there are many facts which indicate that Johnston acted solely to advance the legitimate business interests of his client and to advance his own interests.[124]

---

[120] *Id.*

[121] *Goldstein v. Phillip Morris, Inc.*, 854 A.2d 585, 590 (Pa. Super. 2004).

[122] *Skipworth by Williams v. Lead Industries Association, Inc.*, 690 A.2d 169, 174 (Pa. 1997) (citation omitted).

[123] 412 A.2d at 472.

[124] *Id.*

Some district courts have interpreted this as requiring plaintiffs alleging civil conspiracy to show that the *sole* purpose of the conspiracy was to injure the plaintiffs.[125] But others correctly note that *Thompson Coal* "does not address whether defendants may be liable if they act with mixed motivates."[126] These courts have held that civil conspiracy is colorable even if certain goals of the conspiracy constitute "legitimate business interests" so long as the plaintiff "plausibly alleges that one of the motives of the conspiracy was to injure [the plaintiff]."[127] This Court endorses the latter approach.

Here, Wurth alleges that Strouse—who "loudly voiced his opposition" to Wurth's acquisition of Hermance[128]—teamed up with Homsher to undercut Wurth. The two surreptitiously downloaded and then deleted a substantial amount of Hermance's customer sales data and other confidential information, which, after resigning from the company, they used to poach Hermance's clients.[129] Strouse and

---

[125] *See*, *e.g.*, *Festa v. Jordan*, 803 F. Supp. 319, 327 (M.D. Pa. 2011) (Caputo, J.) ("Because malice can only be found when the sole purpose of the conspiracy is to injure the plaintiff, a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice."); *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009) (holding that malice "is negated by a showing that the acts alleged were done for professional or business benefit").

[126] *Ozburn-Hessey Logistics, LLC v. 721 Logistics, LLC*, 40 F. Supp. 3d 437, 454 n.4 (E.D. Pa. 2014).

[127] *Minehart v. McElhinny*, 2017 WL 5885730, at *5 (E.D. Pa. Nov. 28, 2017); *see also PDC Machines Inc. v. Nel Hydrogen A/S*, 2018 WL 3008531, at *5 (E.D. Pa. June 15, 2018) ("Given the *Thompson* court's definition of malice, this Court is persuaded that the fact that a defendant may benefit economically from improper actions undertaken as part of a conspiracy does not necessarily preclude a finding that the defendant acted with malice, and that the Complaint in this case sufficiently alleges malice on the part of the Defendants.").

[128] Doc. 1 ¶ 10.

[129] *Id*. ¶¶ 12–54.

27

Homsher took these actions even though they signed confidentiality agreements that prohibited them from exploiting "employment confidential information."[130] In its Complaint, Wurth acknowledges that Strouse and Homsher took these actions "for their own personal gain";[131] still, the remaining allegations support a finding that they were also motivated by a desire to injure the company. Given this Court's position on the governing legal standard, that is sufficient to survive dismissal at this stage.

### B.   Wurth's Motion to Dismiss

Responding to Wurth's Complaint, Strouse asserts four counterclaims: (1) unjust enrichment;[132] (2) invasion of privacy—misappropriation of name and likeness;[133] (3) right of publicity;[134] and (4) declaratory judgment.[135] Wurth moves to dismiss Counts I, II, and III.[136] For the reasons provided below, the Court grants Wurth's motion.

### 1.   Counterclaim Count I – Unjust Enrichment

In his first counterclaim, Strouse alleges that Wurth was unjustly enriched by receiving profits on sales that Strouse finalized prior to his departure without

---

[130] Doc. 1 ¶ 9; *see also* Doc. 1-1, Ex. 1 (Apr. 19, 2006 Strouse Confidentiality Agreement); Doc. 1-2, Ex. 2 (Oct. 15, 2015 Homsher Confidentiality Agreement).

[131] Doc. 1 ¶ 1.

[132] Doc. 14 ¶¶ 42–49.

[133] *Id.* ¶¶ 50–54.

[134] *Id.* ¶¶ 55–59.

[135] *Id.* ¶¶ 60–81.

[136] Doc. 19; Doc. 20.

paying Strouse commission.[137] But Strouse's allegations do not show that he is entitled to commissions on these sales or that Wurth's retention of the proceeds from the sales would be unjust.

To state a claim for unjust enrichment, a plaintiff must allege the following: "(1) benefits conferred on one party by another; (2) appreciation of such benefits by the recipient; and (3) acceptance and retention of these benefits in such circumstances that it would be inequitable for the recipient to retain the benefits without payment of value."[138] For the third prong, it is well established that "the mere fact that one party benefits from the act of another is not itself sufficient to justify restitution."[139] Instead, the plaintiff must show "that the party against whom recovery is sought either wrongfully secured or passively received a benefit that would be unconscionable for the party to retain without compensating the provider."[140]

As a preliminary matter, Strouse offers no legal basis for why he is entitled to receive commission for sales completed after he resigned. In his responsive pleading, Strouse asserts that "Hermance's customers made full payment to either Hermance or Wurth on more than half of these sales *either before or after*

---

[137] Doc. 14 ¶¶ 43–48.

[138] *Lauren W. ex rel. Jean W. DeFlaminis*, 480 F.3d 259, 277 (3d Cir. 2007).

[139] *Norris Sales Company, Inc. v. Target Division of Diamant Boart, Inc.*, 2002 WL 31771169, at *4 (E.D. Pa. Dec. 11, 2002) (citing *Meehan v. Cheltenham Township*, 189 A.2d 593, 595 (Pa. 1963)).

[140] *Hershey Foods Corp. v. Ralph Chapek, Inc.*, 828 F.2d 989, 999 (3d Cir. 1987) (citing *Torchia on behalf of Torchia v. Torchia*, 499 A.2d 581 (Pa. Super. 1985)).

Mr. Strouse's departure" and that "customers will make payments on the remaining sales attributable to Mr. Strouse within the next year."[141] But he provides no detail on what (if any) sales were, in fact, completed before he resigned from Hermance. And it is unclear to the Court why Strouse believes he is entitled to commission payments on sales completed after his resignation. Strouse presents no case law establishing that companies are required, as a matter of law, to pay salesmen commission on sales consummated after the salesmen stop working. As such, the only basis for this entitlement would be in contract. And although Strouse alleges that his compensation was largely commission-based pursuant to Hermance policy,[142] he does not plead that this policy obligates Hermance to pay former employees commission on sales they negotiated prior to their departure but that were consummated after.

Additionally, Strouse's allegations do not establish that Wurth's retention of all proceeds from the sales Strouse purportedly negotiated (i.e., without paying Strouse commission) is unjust. In its Complaint, Wurth alleges that in July 2021 it acquired substantially all Hermance assets—including customer sales data and, presumably, receivables.[143] Lacking any allegations to the contrary, the Court

---

[141] *Id*. ¶¶ 44–45 (emphasis added).
[142] *Id*. ¶¶ 25–26.
[143] *See* Doc. 1 ¶¶ 2, 12, 14.

accepts that Wurth compensated Hermance for these assets.[144] As such, to the extent Wurth acquired the receivables from any transactions Strouse negotiated prior to his resignation, Wurth paid Hermance for them. It is not unjust for a company to retain the proceeds from transactions it lawfully acquired.[145]

The only plausible argument Strouse could raise for why Wurth owes him commission is that Wurth, in acquiring Hermance's assets, assumed Hermance's obligations to its current and former employees. But this runs into several problems. First, it is unclear that Wurth did, in fact, assume Hermance's obligations upon purchasing its assets. Wurth asserts it did not,[146] and Strouse does not argue otherwise.[147] Second, even if Wurth did assume Hermance's obligations, the basis for Wurth's alleged liability would sound in contract, not equity: Strouse's right to commissions from Wurth would stem from its prior contract with Hermance.[148] But, as both parties acknowledge, the doctrine of unjust enrichment applies only in the absence of an express agreement.[149] And third, as discussed,

---

[144] In his Answer, Strouse alleges only that he lacks the knowledge or information necessary to confirm that Wurth fully compensated Hermance for its assets; he does not claim that Wurth failed to offer Hermance fair market price for its assets. *See* Doc. 14 ¶¶ 2, 14.

[145] *See Hershey Foods Corp.*, 828 F.2d at 999 (declining to award *quantum meruit* because the disputes services "fall within the scope of agreements which [the plaintiff] entered and for which [the plaintiff] was admittedly compensated").

[146] Doc. 20 at 10 ("[I]t is undisputed that Wurth purchased Hermance's *assets*—nothing else.").

[147] *See* Doc. 30 at 3–6.

[148] *See* Doc. 14 ¶¶ 26–28 (describing the Hermance "Commission Policy").

[149] *See Grudkowski v. Foremost Insurance Co.*, 556 F. App'x 165, 169–70 (3d Cir. 2014) ("Under Pennsylvania law, 'the doctrine of unjust enrichment is inapplicable when the relationship between parties is founded upon a written agreement or express contract.'") (quoting *Wilson Area School District v. Skepton*, 895 A.2d 1250, 1254 (Pa. 2006)).

Strouse does not allege that this contract entitles him to commission on sales consummated after he resigned.

Accordingly, Strouse's unjust enrichment claim, as currently constituted, cannot proceed.

### 2. Counterclaim Count II – Misappropriation of Name and Likeness

For his second counterclaim, Strouse alleges that Wurth misappropriated his name and likeness by displaying on its website videos in which Strouse described projects completed either collectively by Hermance and Highland Automation or exclusively by Highland Automation.[150] Strouse asserts that at least some of the videos, which concern the "operations of both Hermance and Highland [Automation]," are "housed" on Strouse's personal YouTube account and therefore constitute Strouse's personal property.[151] But whether considered under statute or common law, Strouse's allegations fall short.

Preliminarily, the parties disagree over the basis in Pennsylvania law for Strouse's misappropriation claim. Strouse argues the claim is predicated on the common law, which establishes that "[o]ne who appropriates to his own use or benefit the name or likeness of another is subject to liability to the other for invasion of his privacy."[152] The common law misappropriation claim "is not

---

[150] Doc. 14 ¶ 37.
[151] *Id*. ¶¶ 38–39.
[152] Restatement (Second) of Torts § 652C.

limited to commercial appropriation"; it includes claims where a party uses another individual's name or likeness "for his own purposes and benefit, even though the use is not a commercial one, and even though the benefit sought to be obtained is not a pecuniary one."[153]

Wurth counters that the common law claim was abrogated in 2002 when the Pennsylvania legislature enacted 42 Pa. C.S. § 8316, which created a statutory remedy for the unauthorized use of name and likeness.[154] There are three elements to a Section 8316 claim: (1) a natural person's name or likeness has commercial value; (2) a party made an unauthorized use of that name or likeness; and (3) that the use is for commercial or advertising purposes.[155] Accordingly, unlike the common law misappropriation claim, Section 8316 is limited to commercial appropriation.[156]

To date, the Pennsylvania Supreme Court has yet to clarify what effect Section 8316 has on the common law misappropriation cause of action,[157] and district courts within this Circuit have reached differing conclusions on the

---

[153] *AFL Philadelphia LLC v. Krause*, 639 F. Supp. 2d 512, 531 (E.D. Pa. 2009) (citing Restatement (Second) of Torts § 652C cmt. b).

[154] Doc. 20 at 13 n.4 (citing *Kelly v. Peerstar*, 2020 WL 5077940, at *9 (W.D. Pa. Aug. 20, 2020)).

[155] 42 Pa. C.S. § 8316(a).

[156] *See Kelly*, 2020 WL 5077940, at *9.

[157] *See Lundberg v. One Three Five, Inc.*, 2022 WL 2669136, at *8 (W.D. Pa. Jan. 14, 2022) (noting that "the law concerning the tort of appropriation in Pennsylvania is somewhat unsettled due to the legislature's passing this statute, which could subsume the aforementioned common law torts," and that "the Supreme Court of Pennsylvania has not yet made a pronouncement on this issue") (internal quotation marks and citation omitted).

matter.[158] Here, the Court need not opine on the viability of the common law

misappropriation claim: whether considered under Section 8316 or the common

law, Strouse's allegations do not support a claim for misappropriation of name or

likeness.

First, Strouse's allegations do not establish that his name or likeness, as used

in the videos on Wurth's website, has the requisite "value"—commercial or

otherwise. Although Strouse claims he "suffered substantial damages" due to

Wurth's supposed misappropriation,[159] he offers no explanation for how or why

these damages occurred. He does not allege that his name has any special

reputation or prestige such that mention of his name or use of his image in a video

on Wurth's website could confer an actionable benefit.[160]

Second, the pleadings underlying the counterclaims contradict Strouse's

conclusory assertion that Wurth used his name and likeness "without his

---

[158]  *Compare Kelly*, 2020 WL 5077940, at *9 ("Because the Pennsylvania Legislature has enacted a comprehensive legislative scheme on the unauthorized use of a person's name or likeness that is different than the common law scheme, the Legislature abrogated the Pennsylvania common law claim for misappropriation of name or likeness."), *with Lewis v. Marriot International, Inc.*, 527 F. Supp. 2d 422, 429 (E.D. Pa. 2007) (declining to recognize abrogation because there is "no indicia in the text of section 8316 or its legislative history suggesting that it was intended as an exclusive remedy to replace the common-law cause of action of invasion of privacy by misappropriation of identity").

[159]  Doc. 14 ¶ 53.

[160]  *See* Restatement (Second) of Torts § 652C cmt. c ("In order that there may be liability under the rule stated in this Section, the defendant must have appropriated to his own use or benefit the reputation, prestige, social or commercial standing, public interest or other values of the plaintiff's name or likeness."); 42 Pa. C.S. § 8316(a) (statutory misappropriation claims are limited to "natural person[s] whose name[s] or likeness[es] [have] commercial value").

authorization."[161] As Strouse admits, prior to his resignation in June 2021, he

served as Hermance's President and CEO,[162] and it appears from his pleadings that

he produced the videos in question when employed by Hermance.[163] To the extent

the videos depict Strouse describing projects completed by Hermance, Wurth's

usage of those videos (and Strouse's likeness depicted therein) would be

authorized: Wurth acquired Hermance's assets, and therefore it is entitled to

display videos produced for Hermance's benefit that contain Hermance employees

describing Hermance projects. And although Strouse alleges that the videos may

contain descriptions of projects "completed solely by Highland," he is vague and

equivocal.[164] Indeed, per Strouse's allegations, the number of videos containing

projects completed by Highland without Hermance's involvement may be zero.[165]

If Strouse's claim for misappropriation stems from Wurth's use of Highland-

specific content, he must present some non-conclusory factual allegations

supporting this theory; lacking pleadings to this effect, he has not stated a valid

cause of action for misappropriation of name and likeness.

### 3.    Counterclaim Count III – Right of Publicity

Strouse predicates his third counterclaim—styled as a violation of his "right

of publicity"—on the same facts underlying the second: "Wurth has appropriated

---

[161] Doc. 14 ¶ 52.

[162] *Id*. ¶ 4.

[163] *See id.* ¶¶ 37–39.

[164] *Id*. ¶ 37.

[165] *Id.*

the name and/or likeness without the authorization of Mr. Strouse" and "created

confusion in the marketplace by continuing to associate Mr. Strouse and his

business operations, including Highland [Automation], with Wurth even after

Mr. Strouse's departure."[166] But to maintain a claim based on the right of publicity,

a plaintiff must allege that the defendant "appropriat[ed] its valuable name or

likeness, without authorization, [and used] it to [the] defendant's commercial

advantage."[167] As explained above, Strouse fails to allege that his name or likeness

has commercial value and that Wurth's use of his name or likeness was without

authorization. Accordingly, this claim likewise cannot proceed.

## IV.   CONCLUSION

According to Wurth, Strouse and Homsher stole a substantial amount of

Hermance's confidential client information just before Wurth acquired Hermance.

Armed with this information, Strouse and Homsher resigned and refashioned a

separate, preexisting company into a competitive outfit, poaching Hermance (now

Wurth) clients and sales. Strouse's and Homsher's protestations notwithstanding,

these allegations state claims for tortious interference with contract and prospective

economic advantage, breach of contract, and civil conspiracy. Conversely,

Strouse's counterclaims lack the factual predicates to proceed. Counterclaim

---

[166] *Id*. ¶ 57.

[167] *Rose v. Triple Crown Nutrition*, 2007 WL 707348, at *3 (M.D. Pa. Mar. 2, 2007) (McClure, J.) (quoting *World Wrestling Federation Entertainment Inc. v. Big Dog Holdings, Inc.*, 280 F. Supp. 2d 413, 443 (W.D. Pa. 2003)).

Counts I, II, and III are therefore dismissed, but with leave to plead over; to the

extent Strouse can remedy these counterclaims' deficiencies with additional factual

allegations, he may do so.

An appropriate Order follows.

BY THE COURT:


_s/ Matthew W. Brann_
Matthew W. Brann
Chief United States District Judge